UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GUY DeMASELLIS,

        Plaintiff,

                                      Case Number 10-12138-BC
v.                                      Honorable Thomas L. Ludington

SAINT MARY'S OF MICHIGAN,

        Defendant.

_____ /

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This employment dispute arises out of the termination by Defendant St. Mary's of Michigan of Plaintiff Guy DeMasellis, who brings claims for gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and Michigan's Elliot Larsen Civil Rights Act ("ELCRA"). Defendant now moves for summary judgment. ECF No. 14. For the reasons discussed below, the Court will grant Defendant summary judgment on Plaintiff's Title VII claims and decline jurisdiction over Plaintiff's state law claims.

### I.

Plaintiff, a registered nurse, began working for Defendant in June 2001. An at-will employee, Plaintiff was provided a copy of Defendant's associate handbook. The handbook outlines thirty-two "illustrative examples" of conduct which Defendant "expressly wants associates to avoid," including, inter alia, "[i]nappropriate conduct or language," "[i]nsubordination," "[a]busing or injuring a patient physically or verbally," and "[d]isruptive behavior." Def.'s Mot. Summ. J. Ex. B, at 41–42, ECF No. 14-3 ("Def.'s Mot."). Engaging in such conduct, the handbook explains, may "constitute the basis for disciplinary action up to and

including termination from employment." *Id*. at 41. Disciplinary actions short of discharge include "verbal warning," "written warning," and "suspension." *Id*. at 43.

In April 2002, Defendant suspended Plaintiff for one day for "verbal abuse of a patient." *Id*. at 11. The contemporaneous "Notice of Corrective Action" explained that Plaintiff was suspended because he "used threatening foul language to the [patient] in front of wife and daughter." *Id*. Plaintiff endorsed the notice without comment. In his deposition, however, he recalled that "the patient was the one that was cursing and being violent and yelling and swinging in front of his wife and his daughter." Pl.'s Dep. 42:8–13, Feb. 3, 2011, *attached as* Pl.'s Opp'n Mot. Summ. J. Ex. 2, ECF No. 18 ("Pl.'s Opp'n").

In April 2004, Defendant again reprimanded Plaintiff with a one-day suspension after learning that Plaintiff had intravenous fluids administered to himself without a physician's order. Def.'s Mot. Ex. B, at 10. Plaintiff again signed the notice of corrective action without comment. In his deposition, Plaintiff concedes that his conduct was unacceptable. Pl.'s Dep. 43:1–16.

In January 2005, Defendant issued Plaintiff a written warning (but not a suspension) for, inter alia, "inappropriate behavior while interacting [with] an associate from another unit." Def.'s Mot. Ex. B, at 9. Plaintiff signed the notice of corrective action with the comment "I disagree vehemently." *Id*. In his deposition, Plaintiff recalled of the other associate involved in the incident: "I can't remember what her name is. All I remember is she's from the, working in the PAC U[,] and she was very rude and condescending." Pl.'s Dep. 44:23–25.

Less than four months later, Plaintiff was again reprimanded, this time with a two-day suspension. The notice of corrective action explained that the suspension was "for inappropriate behavior when interacting [with a] patient's family member." Def.'s Mot. Ex. B, at 8. Plaintiff refused to sign the notice.

In April 2007, Plaintiff requested, and was granted, a transfer to one of Defendant's "rapid response teams."  Designed to assist patients undergoing significant changes in condition, the teams were staffed by an internal medicine resident, a respiratory therapist, an in-house pharmacist, and a registered nurse qualified in advanced cardiac life support.  Other registered nurses on rapid response teams included James Weyker, Lori Qidsala, and Jenni Sterkowitz (who, like Plaintiff, was issued a "last chance agreement" and later terminated).

In February 2008, Plaintiff was involved in five incidents that resulted in a three-day suspension and a "last chance agreement."  *See* Def.'s Mot. Ex. B, at 6–7.  First, "in early February, Dr. Babu [Paidipaty] indicated that an incident occurred that showed a lack of respect towards him and the lack of sensitivity towards the patient during a chest tube insertion."  *Id*. at 6.  Second, on February 10, a patient's family complained to the nurse manager regarding Plaintiff's sedation of the patient.  *Id*.  Expressing concern about Plaintiff's conduct, the family asked that Plaintiff no longer be permitted to care for the patient.  Third, on February 13, Dr. Paidipaty complained that while he was speaking to a patient's family about hospice care, Plaintiff paged him to the surgical intensive care unit.  *Id*. at 303.  After the doctor told Plaintiff that he would be down shortly, Plaintiff paged the doctor once each minute until the doctor arrived, about ten minutes later.  *Id*.  When the doctor inquired about the repeated pages, Plaintiff responded "we are waiting for you."[1]  *Id*.  "He was extremely rude, arrogant, loud in the unit, totally disrespectful," the doctor wrote to the chief nursing officer, concluding: "I would probably go to the extent of saying from now on I prefer [Plaintiff] not take care of my patients."

---

[1] Asked about this incident during his deposition, Plaintiff was questioned: "[D]id you page [the doctor] every minute for more than ten minutes?" Pl.'s Dep. 36:19–20. "No I did not," Plaintiff responded.  Pl.'s Dep. 36:21.  "Do you recall how many times you did page him?" Defendant's counsel further inquired.  Pl.'s Dep. 37:2. "I paged him multiple times. I can't remember exactly how many times," Plaintiff replied.  Pl.'s Dep. 37:3–4.

-3-

*Id.* Fourth, a few days after the paging incident, Plaintiff dismissed the nurses who were caring for a patient during a "code blue" (when a patient needed immediate resuscitation). In a "disrespectful and unprofessional" tone, he declared: "I'm here, the 6ICU [the Sixth Floor Intensive Care Unit] nurses can leave the room."   *Id.* at 6, 288.   And fifth, during a rapid response call on February 20, Plaintiff exhibited such "rude and unprofessional behavior" towards another nurse such that a patient who was present complained of Plaintiff's conduct.  *Id.*

On March 4, 2008, Plaintiff was presented with a "last chance agreement."   "We are giving you the opportunity to correct your behavior," the last chance agreement provided, but further cautioned: "please be advised that this is your final warning and that any further incidents of disruptive behavior or violation of St. Mary's of Michigan policies will result in your immediate termination."  Def.'s Mot. Ex. B, at 6, 7.  The agreement also provided that Plaintiff would be suspended for three days and required to attend five weekly counseling sessions with Catholic Family Services "to address these behaviors."   *Id.* at 6.   Plaintiff endorsed the agreement with the caveat "I do not agree with items 1–4."

After Plaintiff's first counseling session, the counselor recorded that Plaintiff "has a very strong almost abrasive personality.  He is physically strong with a booming voice.  He says he does not shrink from the truth and believes others should always be told it.  Tact does not appear to be his fort[é]."  Def.'s Mot. Ex. B, at 44.   Under "Key Problem Areas," the counselor enumerated "inability to see himself as others see him," "places blame on others," and "believes in truth at all times."  *Id.* at 45.   Under "Clinical Formulations," the counselor recorded: "Guy views his problems as developing from the incompetence and rudeness of others."  *Id.*

In May 2008, a secretary complained that Plaintiff physically abused a patient by putting the patient in a headlock.  *Id.* at 31.  An investigation revealed that "[t]he patient was combative.

-4-

He was swinging at the staff and swinging at security." Pl.'s Dep. 75:8–10. No disciplinary action was taken.

Also in May 2008, a female nurse complained of harassment; specifically, she alleged that Plaintiff had been "making comments to [her] coworkers that [she] sleeps around." Def.'s Mot. Ex. B, at 29. Defendant's human resources manager, Bernie Jore, investigated. His notes reflect that when asked, Plaintiff acknowledged that "a discussion had occurred but he had no intention of it being sexually charged." *Id*. at 28. No disciplinary action was taken; however, Mr. Jore instructed Plaintiff to "keep distance between himself and [the nurse in question]." *Id*. In his deposition, Plaintiff recalled of these incidents: "I was getting accused of things and . . . there was absolutely no validity to these items. And, you know, here's somebody saying, oh, you know, female nurse goes and complains and the next thing you know here it is, it's Guy." Pl.'s Dep. 71:12–16.

In August 2008, Mr. Jore was asked to investigate a complaint regarding Plaintiff's "rude [and] disrespectful behavior to staff [and Dr. Sheth]." Def.'s Mot. Ex. B, at 33. Mr. Jore recorded that he "informed Guy that he has got to learn how to work [with] people." *Id*. "Guy was reminded that he was on a last chance agreement and this type of behavior could be detrimental to his continued employment," Mr. Jore's notes added. *Id*. No disciplinary action was taken. In his deposition, Plaintiff recalled: "I explained to him how inappropriate and rude Dr. Sheth was at that time. And this is the conversation where we also, where Bernie [Jore] expressed to me that I needed to be aware that I am in a female dominated profession and that it was my choice and that these things are going to happen and either deal with it, deal with the, being talked about continuously and/or the perceptions on their aspect [sic] or move on." Pl.'s Dep. 76:15–23. According to Plaintiff, Mr. Jore reiterated: "Guy, this is a female dominated

-5-

profession. If you can't handle them or don't want to deal with the rumor mill and stuff like that, you know, it's what you signed on for.  It's what you have to deal with."  Pl.'s Dep. 72: 9–12.

Mr. Jore, however, vehemently denies that he ever made such remarks.  For example, in Mr. Jore's deposition, Plaintiff's counsel inquired: "[Plaintiff's state agency charge of discrimination] says, I also spoke to human resources and was told that I had to put up with the problem always being with me because I am a male nurse in a female profession.  Do you know who in human resources he's referring to?"  Jore Dep. 9:17–21, Feb. 4, 2011, *attached as* Pl.'s Opp'n Ex. 6.  "No, I don't," Mr. Jore responded.  Jore Dep. 9:22.  Plaintiff's counsel did not inquire further.  However, Mr. Jore later returned to the subject.  Reading Plaintiff's responses to the EEOC questionnaire, Mr. Jore volunteered:

> ["] It was well expressed to me that I [Plaintiff] should understand and have to put up with the problem always being with me because I'm a male nurse working in a female profession["] . . . that is not something I [Mr. Jore] would say or even allow to be said in my presence.  I don't believe it's accurate.

Jore Dep. 20:7–12.

In January 2009, Defendant investigated a complaint that Plaintiff had not responded to a call to assist a patient.  No disciplinary action was taken.  Also in January 2009, a fellow registered nurse of Plaintiff, Robert Owczarzak, was placed on administrative leave pending an investigation for his allegedly intimidating, coercive behavior and obscene, abusive language towards coworkers and patients.  Mr. Owczarzak had begun his employment with Defendant in 2000 (a little less than a year before Plaintiff was hired) as a registered nurse in the Sixth Floor Intensive Care Unit.  At the time he was placed on administrative leave, he was working in Defendant's emergency room.  Following an investigation, Mr. Owczarzak was terminated.

-6-

A little less than three weeks after Mr. Owczarzak was terminated, Plaintiff was in the Sixth Floor Intensive Care Unit's nursing station when the unit manager, Joseph Rychlicki, approached the station.  Plaintiff asked to speak with Mr. Rychlicki privately.  Following Plaintiff into a stairwell, Mr. Rychlicki recounts what happened next:

> In a loud tone and somewhat aggressively, he asked me why Rob Owczarzak was not offered the opportunity to transfer out of the emergency department rather than be terminated. . . . Then Guy stated that the nurse manager in the E.R. had a history [of] allowing the female staff [to] slide on offences and coming down hard on the male staff for similar offenses. . . . He then began to talk about a "hit list" that had been generated several months ago by someone in management.  This list contained name[s] of nursing staff that w[ere] felt to be disruptive and undesirable.  He then indicated that he was on that list and he had talked to several others that were on that list, some of which are employed elsewhere and as soon as the list was made available there may be legal action. . . .

> He then changed the subject to staff members on [the Sixth Floor Intensive Care Unit,] stating that several he talked to were likely to leave due to [the] incompetence of the management on all levels at St. Mary's of Michigan.  He went on to say that a new orient on [the Sixth Floor Intensive Care Unit] was dangerous due to the inability to take advice and after talking with this orient about patient care issues questioned the orient[']s knowledge.

> Finally he finished this conversation with a statement addressing his negative feeling about a new director that was just appointed, the job duties of several of the nurse managers and that they are incompetent in those positions.

Def.'s Mot. Ex. B, at 26–27.  Mr. Rychlicki recorded the above in a memorandum, which he sent to Mr. Jore.

On February 3, 2009, Mr. Jore and Laura Acton, one of Defendant's directors, met with Plaintiff and terminated him.  The "Notice of Corrective Action" references the conversation with Rychlicki and explains:

> During the course of that discussion you made accusations about how corrective actions were handled for situations you were not involved in. You also discussed an alleged "hit list" of employees[.]  You referenced this list and informed Joe [Rychlicki] you were on it and were talking to others on it here at the hospital. Since learning of this information other instances of disruptive behavior have

been brought to management[']s attention, such as making staff on [the Sixth Floor Intensive Care Unit] cry. This is a continued trend of disruptive behavior in the workplace and is unacceptable. In accordance with your last chance agreement on March 4, 2008[,] your conduct will result in the next step of corrective action [termination].

Pl.'s Opp'n Ex. 5. Plaintiff refused to sign the notice. When asked in his deposition "What is your memory of what was discussed at this termination meeting?" Plaintiff responded:

They asked me about my discussion with Joe [Rychlicki]. I told them exactly what I stated today[,] the fact that I talked to Joe about him not sticking up for Rob, not help try and get Rob out of there and if, when they brought up the hit list the aspect of things that I told them exactly like I said here, told them if he had knowledge of it or had his hands on the hit list the rumor that has been out there for years that he just needs to be careful.

Pl.'s Dep. 86:10–18. "Anything else you recall being discussed at the termination meeting?" Defendant's counsel inquired. Pl.'s Dep. 86:19–20. Plaintiff responded:

Like they say here, tried to discuss me with [sic] my behavior and I said like I've tried everything possible to make everybody happy around here from not talking to people to talking overly friendly to people to not being, you know, to just being straightforward and things along those lines, every communication technique possible with these staff members and yet the women around here continuously try to sit there and make things up and make allegations and make complaints.

Pl.'s Dep. 86:21–87:5. "Anything else?" counsel further inquired. Pl.'s Dep. 87:6. "I don't recall anything else except for saying, well, I won't resign, and if you are going to terminate me, terminate me." Pl.'s Dep. 87:7–9.

Mr. Jore escorted Plaintiff to collect his personal belongings. Along the way, Plaintiff recalled in his deposition:

We just kind of chatted on the way. He said "I know you are a good guy" and things like that "but you know, it's just the way it is. You are a guy. I would love to go have a beer with you, but you don't fit here" was, you know, one of those things. I said my career is not done. Eventually somebody will hear more from me.

Pl.'s Dep. 87:19–25. Mr. Jore, when deposed, was asked:

> Q: After you had the meeting terminating [Plaintiff], did he at anytime tell you that he felt he was being retaliated against?
> A: No.
> Q: Did he at anytime tell you that he felt he was being discriminated against because he was a male?
> A: No.
> . . .
> Q: Were you biased against [Plaintiff] because he was a male?
> A: No.
> Q: Were you looking for a reason to fire him?
> A: No.
> . . .
> Q: And finally, when he was terminated, was that because he had in your opinion violated the last chance agreement by continuing the pattern of disruptive conduct?
> A: Yes.

Jore Dep. 50:18–24, 54:1–5, 54:19–23.  Plaintiff, when deposed, was asked: "Do you feel that Bernie Jore was biased against you because of your gender?"  Pl.'s Dep. 128:20–21.  "No, not Bernie Jore," Plaintiff responded.  Pl.'s Dep. 128:22.  Following his termination, Plaintiff was replaced by a male nurse, Chris Gunther.

On May 27, 2010, Plaintiff filed a one-count complaint alleging gender discrimination in violation of Title VII and the ELCRA.  Specifically, the complaint alleges that "Plaintiff is a member of a protected class by virtue of his gender," that his "gender was a factor in his discriminatory treatment," that "similarly situated individuals outside Plaintiff's protected class were treated more favorably than Plaintiff," and that "Defendant's actions affected a term, condition, and privilege of Plaintiff's employment."  Compl. ¶¶ 19, 20, 21, 22, ECF No. 1.  The complaint further alleges that "not only was Plaintiff discriminated against because of his gender, but because of Plaintiff's complaints to management, Defendant also retaliated against him and terminated his employment."  *Id*. ¶ 13.  Defendant now moves for summary judgment.

## II.

A motion for summary judgment should be granted if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party, who must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. Pro. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III.

"It shall be an unlawful employment practice for an employer," Title VII provides, "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The ELCRA contains a similar prohibition against an employer discriminating against an employee on the basis of an employee's gender. Mich. Comp. Laws § 37.2202(1)(a).

"Under both Title VII and the ELCRA, a Plaintiff has two alternative ways to show reverse discrimination: through direct evidence, or through circumstantial evidence. Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Thompson v. City of Lansing*, 410 F. App'x

922, 929 (6th Cir. 2011) (internal quotation marks omitted) (quoting *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 570 (6th Cir. 2003)).  "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group."  *Johnson v. Kroger Co*., 319 F.3d 858, 865 (6th Cir. 2003).

"If a plaintiff cannot present direct evidence of discrimination, he may prove his claim through circumstantial evidence, applying the familiar burden-shifting analysis set forth in *McDonnell Douglas*."  *Thompson*, 410 F. App'x at 932 (internal citation omitted) (citing *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973)).  Under *McDonnell Douglas*, a plaintiff may establish a rebuttable presumption of discrimination by introducing evidence that he was: (1) a member of a protected class; (2) subject to an adverse employment action; (3) qualified for the position; and (4) replaced by a person outside the protected class or treated differently than similarly situated non-protected employees.  *White v. Baxter Healthcare Corp*., 533 F.3d 381, 391 (6th Cir. 2008) (citing *McDonnell Douglas*, 411 U.S. at 802).

In "reverse discrimination" cases, however, "where a member of the majority group claims discrimination," the Sixth Circuit has modified first prong of the prima facie case. *Simpson v. Vanderbilt Univ*., 359 F. App'x 562, 569 (6th Cir. 2009) (citing *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004)).  "In such cases, the plaintiff must establish the first prong by showing that there are background circumstances indicating that the defendant employer is the unusual employer who discriminates against the majority."  *Thompson*, 410 F. App'x at 932 (internal quotation marks omitted) (quoting *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003)).  Consequently, a "reverse discrimination complainant bears the burden of

demonstrating that he was intentionally discriminated against despite his majority status." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (internal quotation marks omitted).  Under the ELCRA, in contrast, a plaintiff alleging reverse discrimination is held to the same standard as a plaintiff in any other claim of discrimination.  *Lind v. City of Battle Creek*, 470 Mich. 230, 232–34 (2004).

"If the plaintiff establishes a prima facie case of reverse discrimination, the burden then shifts to the employer defendant to articulate some 'legitimate, nondiscriminatory reason' for the adverse action."  *Thompson*, 410 F. App'x at 932 (quoting *McDonnell Douglas*, 411 U.S. at 802).  "If the employer meets this burden, the burden shifts back to the plaintiff to show that the defendant's stated reason was not its true reason, but merely a pretext for discrimination."  *Id*.

## A.

As direct evidence of discrimination, Plaintiff proffers two statements allegedly made by Mr. Jore.  The first came in an August 2008 conversation, in which, according to Plaintiff, Mr. Jore said: "Guy, this is a female dominated profession.  If you can't handle them or don't want to deal with the rumor mill and stuff like that, you know, it's what you signed on for.  It's what you have to deal with."  Pl.'s Dep. 72: 9–12.  Mr. Jore, however, denies saying this, testifying in his deposition: "that is not something I would say or even allow to be said in my presence. I don't believe it's accurate."  Jore Dep. 20:7–12.

The second statement allegedly came after Plaintiff was terminated.  As Mr. Jore escorted Plaintiff to collect his personal belongings, Plaintiff recalled in his deposition:

> We just kind of chatted on the way.  He said "I know you are a good guy" and things like that "but you know, it's just the way it is. You are a guy. I would love to go have a beer with you, but you don't fit here"[; it] was, you know, one of those things.  I said my career is not done.  Eventually somebody will hear more from me.

Pl.'s Dep. 87:19–25.  "Both of these remarks," Plaintiff writes, "[are] clearly indicative of discriminatory bias."  Pl.'s Br. Opp'n Mot. Summ. J. 11 ("Pl.'s Br.").  Plaintiff elaborates that "this evidence, which directly references Plaintiff and ability to fit in constitute direct evidence of discriminatory intent.  The second comment occurred immediately after Plaintiff was informed of his termination and was made by a decision-maker."  *Id*. at 10.

Plaintiff's argument is unpersuasive.  Indeed, his assertion that this is direct evidence of discriminatory animus is flatly contradicted by Plaintiff himself.  In his deposition, Plaintiff was asked: "Do you feel that Bernie Jore was biased against you because of your gender?"  Pl.'s Dep. 128:20–21.  "No, not Bernie Jore," Plaintiff responded.  Pl.'s Dep. 128:22.  The only probative value the alleged statements have is inferential — what they suggest Mr. Jore believed of other employees' attitudes.  The statements are not direct evidence of discriminatory animus.

Mr. Jore, moreover, emphatically denies ever making either of these statements.  The only evidence that they were made is Plaintiff's own deposition testimony — Plaintiff offers no corroboration from witnesses or other independent evidence from third parties who had similar conversations with Mr. Jore.  *See Shaw v. Danley*, 202 F.3d 270, 2000 WL 64945, at *7 (6th Cir. Jan. 10 2000) (table) (discounting probative value of self-serving statements); *Evans v. Techs. Applications & Serv. Co*., 80 F.3d 954, 962 (4th Cir. 1996) (same); *Toma v. Gen. Revenue Corp*., No. 07–13018, 2008 WL 302378, at *3 (E.D. Mich. Feb. 1, 2008) ("The affidavits contain precisely the type of self-serving statements which are directly refuted by General's detailed records. This is insufficient to create a genuine issue of material fact.").  This is not a case in which independent corroboration is impossible because only the plaintiff and the speaker were present when the alleged statements were made.  Regarding the statement allegedly made in

-13-

August 2008, for example Plaintiff alleges at least one other person was present, Cyndi Braley. *See* Pl.'s Br. 9–10. Plaintiff, in fact, deposed Ms. Braley. Yet he did not question her regarding Mr. Jore's alleged comments. *See* Braley Dep. *passim*, Feb. 4, 2011, *attached as* Pl's Ex. 7. Drawing all reasonable inferences in Plaintiff's favor, he has not offered direct evidence of gender discrimination. Accordingly, he must attempt to establish his claim, if at all, through circumstantial evidence.

## B.

Defendant contends that Plaintiff cannot establish the first, third, or fourth elements of a prima facie case under *McDonald Douglas*. As explained below, Plaintiff has established the first and second elements; he has not established either the third or fourth elements.

### 1.

In reverse discrimination cases — when claims of discrimination are brought by "plaintiffs who are white or male" — plaintiffs must establish "background circumstances [that] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Pierce v. Commonwealth Life Ins. Co*, 40 F.3d 796, 801 & n.7 (6th Cir. 1994) (internal quotation marks omitted) (quoting *Parker v. Baltimore & Ohio R.R. Co*., 652 F.2d 1012, 1017 (D.C. Cir. 1981)); *see also Simpson v. Vanderbilt Univ*., 359 F. App'x 562, 568–69 (6th Cir. 2009) (applying "background circumstances" requirement to male nurse's complaint because his "Title VII claim is that Vanderbilt discriminated against him because he is male").

"The Sixth Circuit has not developed a bright line test," a judge of this district has dryly observed, "for what constitutes 'background circumstances' for the purpose of the first *McDonnell Douglas* prong in a reverse discrimination case." *DeBiasi v. Charter County of Wayne*, 537 F. Supp. 2d 903, 916 (E.D. Mich. 2008). The Sixth Circuit's opinions do, however,

provide some guidance.  In *Zambetti v. Cuyahoga Community College*, 314 F.3d 249 (6th Cir. 2002), for example, the court concluded that a white police officer had satisfied the "background circumstances" requirement when an African-American police chief repeatedly passed him over for promotion.  *Id*. at 257.  Applying this rationale in *Plumb v. Potter*, No. Civ. 04-72902, 2005 WL 2739328 (E.D. Mich. Oct. 24, 2005), a court of this district concluded that a male plaintiff had satisfied the "background circumstances" requirement when the decisionmaker was female.  *Id*. at *3.  Similarly, the court explained on another occasion that "[t]he composition of the workforce," when considered in conjunction with "the sex of the plaintiff's supervisor . . . similarly . . . constitute sufficient background circumstances to satisfy the first prong of the *McDonnell Douglas* test."  *DeBiasi*, 537 F. Supp. 2d at 917 (citing *Turner v. Grande Pointe Healthcare Cmty.*, No.: 1:05-CV-1327, 2007 WL 2601386 (N.D. Ohio Sept. 10, 2007)).

Separately, in *Sutherland v. Michigan Department of Treasury*, 344 F.3d 603 (6th Cir. 2003), the Sixth Circuit concluded that the plaintiffs had satisfied the "background circumstances" requirement by presenting "significant evidence in the form of statistical data tending to show that in the years prior to the employment decisions at issue, the Treasury Department considered race in making employment decisions."  *Id*. at 615.

In this case, Plaintiff has no evidence in the form of statistical data.  However, one of the two decisionmakers was female.  Both of Plaintiff's supervisors, Ms. Sayles and Ms. Braley, were female.  And the majority of the nurses on Defendant's staff were female.  *See* Recker Dep. 12:10–12.  Although a close question, under *Zambetti*, *Plumb*, and *DeBiasi*, Plaintiff has satisfied the "background circumstances" test.

**2.**

Defendant does not contest that Plaintiff has established the second element — that he was subject to an adverse employment action.  Plaintiff was terminated.

**3.**

In contrast to the first two elements, Plaintiff has not established the third element of the *McDonnell Douglas* prima facie case — that he was qualified for his position — because he has not established that he was performing his job consistent with his employer's reasonable expectations.  *See Ang v. Proctor & Gamble Co.*, 932 F.2d 540, 548–49 (6th Cir. 1991), *abrogated on other grounds by Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006), *as recognized in Hill v. Nicholson*, 383 F. App'x 503, 508 (6th Cir. June 24, 2010).

In *Ang*, for example, the Sixth Circuit concluded that the plaintiff had not established this element "because he failed to meet his employer's expectations."  932 F.2d at 548 (citing *McDonald v. Union Camp Corp*, 898 F.2d 1155, 1160 (6th Cir. 1990)).  The court explained: "Evaluations of [the plaintiff] . . . indicate that he had trouble communicating, was late with assignments, used insufficient detail in writing plans, and was a poor long-range planner.  [The plaintiff], then, was not qualified and thus did not establish a *prima facie* case."  *Id.*

In accord, in *McDonald* the court held:  "In order to show that he was qualified, [the plaintiff] must prove that he was performing his job at a level which met his employer's legitimate expectations."  898 F. 2d at 1160 (internal quotation marks omitted) (quoting *Huhn v. Koehring*, 718 F.2d 239, 243 (7th Cir. 1983)).  Addressing the plaintiff's argument, the court recounted:

> [The plaintiff] argues that [the employer] made too big a deal out of his alleged "people problems." However, the aim is not to review bad business decisions, or question the soundness of an employer's judgment.  [The plaintiff] was simply

-16-

> not performing to [the employer's] satisfaction. Since [the plaintiff] concedes this point, there remains no genuine issue of material fact as to whether he was qualified.

*Id*. (citation omitted) (citing *Wilkins v. Eaton Corp*., 790 F.2d 515, 521 (6th Cir. 1986)).

In this case, Defendant contends that Plaintiff did not meet Defendant's legitimate expectations because of the "repeated violations of St. Mary's established rules of conduct." Def's Br. 13. Plaintiff does not address this argument. Rather, Plaintiff contends that he was qualified because he "had very good clinical skills." Pl.'s Br. 14 (quoting Jore Dep.). Although Plaintiff is correct that the record contains evidence that he was a technically proficient — indeed, a superior — registered nurse, his technical skills were not the subject of the disciplinary actions. As in *McDonald*, Defendant was dissatisfied with Plaintiff's "people problems." As in *McDonald*, it is not the task of this Court to review the wisdom of the employer's decision (here, to terminate a technically superior nurse because of perceived deficiencies in interpersonal skills). Rather, as the record contains ample evidence that Plaintiff's behavior was not meeting his employer's expectations, he has not established the third element of the *McDonnell Douglas* prima facie case.

### 4.

Likewise, Plaintiff has not established the fourth element of the *McDonnell Douglas* prima facie case — that he was replaced by a person outside the protected class or treated differently than similarly situated employee outside the protected class. Plaintiff concedes, as he must, that he was not replaced by a person outside the protected class. He was replaced by a gentleman named Chris Gunther. Instead, Plaintiff argues that he was treated differently than one particular similarly situated female employee, writing that "for purposes of responding to

Defendant's motion, Plaintiff focuses on the most comparable employee, Theresa Skimpson." Pl.'s Br. 15.  Plaintiff's comparison is unpersuasive.

"To be deemed 'similarly situated,' [the] individuals with whom [the plaintiff] seeks to compare his treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *see also Noble v. Brinker Int'l, Inc*., 391 F.3d 715, 729 (6th Cir. 2004).  That is, "the plaintiff must show that the 'comparables' are similarly-situated *in all respects*."  *Mitchell*, 964 F.2d at 583 (emphasis in original) (citing *Stotts v. Memphis Fire Dep't*, 858 F.2d 289 (6th Cir.1988)).  Thus, Plaintiff must compare himself to a female registered nurse who reported to the same supervisors, Ms. Sayles and Ms. Braley, who engaged in the same type of conduct, and who was not terminated.  Plaintiff has not done so.

The sole employee Plaintiff's brief seeks to compare Plaintiff to — Theresa Skimpson — does not report to the same supervisors.  Ms. Skimpson works in the surgical intensive care unit; consequently, she is supervised by neither of Plaintiff's supervisors, Ms. Sayles and Ms. Braley. And, although Plaintiff did work in the surgical intensive care unit for a time, in 2007 he joined the rapid response team.  Moreover, the incidents leading to his last chance agreement and ultimate termination of course occurred while he was on the rapid response team.

Additionally, Plaintiff has not demonstrated that Ms. Skimpson's conduct was substantially similar to Plaintiff's.  Unlike the complaint regarding Plaintiff's behavior towards a supervisor, Ms. Skimpson's complaint involved curtness to a patient's family.  Unlike Plaintiff, "Ms. Skimpson acknowledged responsibility for her actions and changed her behavior."  Def.'s Br. Supp. Mot. Summ. J. 16 ("Def.'s Br.").  Thus, even if Ms. Skimpson was an otehwise

similarly situated employee — and she was not — Plaintiff has not established that she "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish [her] conduct or the employer's treatment of [her] for it." *Mitchell*, 964 F.2d at 583. Indeed, the most similarly situated employee to Plaintiff was Jenni Sterkowitz, who also worked on the rapid response team and also was issued a "last chance agreement." Her employment was also, of course, terminated.

Accordingly, Defendant is entitled to summary judgment on Plaintiff's gender discrimination claim under Title VII because he has not established a prima facie case of discrimination.

## IV.

"It shall be an unlawful employment practice," Title VII provides in pertinent part, "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(A). "To make out a prima facie case of retaliation under the familiar *McDonnell Douglas* standard," the Sixth Circuit explains, the plaintiff must establish that: "(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to [the plaintiff]; and (4) there was a causal connection between the protected activity and the adverse employment action." *Hill v. Air Tran Airways*, 416 F. App'x 494, 497 (6th Cir. 2011) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). "The ELCRA also prohibits employer retaliation for filing a complaint of harassment," requiring the same four elements for a prima facie case of retaliation. *Galeski v. City of Dearborn*, __ F. App'x ___, 2011 WL 3568888, at *10 n.6 (6th Cir. Aug. 9, 2011) (citing Mich. Comp. L. § 37.2701(a)).

If the plaintiff establishes a prima facie case, under the familiar burden shifting analysis, the onus is placed on the defendant "to articulate a legitimate, nondiscriminatory reason for its actions." *Hill*, 416 F. App'x at 497 (citing *Virts v. Consol. Freightways Corp. of Del.*, 285 F.3d 508, 521 (6th Cir. 2002)). If the defendant does, the burden shifts back to the plaintiff "to show that the given reason was a mere pretext for retaliation." *Id*.

## A.

Defendant challenges only the final element of Plaintiff's prima facie case — the "causal connection." *See* Def.'s Br. 19–20. "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection." *Hill*, 416 F. App'x at 497 (quoting *Mickey v. Zeidler Tool & Die Co*., 516 F.3d 516, 525 (6th Cir. 2008)). "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action," the Sixth Circuit cautions, "the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey*, 516 F.3d at 525; *see also Hill*, 416 F. App'x at 497 (reversing district court's grant of summary judgment to employer because "[a] jury could infer retaliatory motive from the temporal proximity between [the plaintiff's] complaints of discrimination and the company's decision to terminate him [three days later]"); *McNett v. Hardin Cmty. Fed. Credit Union,* 118 F. App'x 960, 965 (6th Cir. 2004) (finding causal connection when "only 13 days" separated protected activity from adverse action); *Shefferly v. Health Alliance Plan of Mich.*, 94 F. App'x 275, 285 (6th Cir. 2004) (finding that plaintiff has established a prima facie case of retaliation due to "the passage of less than three weeks between [the employer's] receipt of the charges and the adverse actions"); *Mallory v. Noble Corr. Inst.*, 45 F. App'x 463, 472–73 (6th Cir. 2002) ("[T]he fact that retaliation occurs

'very close' in time after a person engages in conduct protected by Title VII may suffice to satisfy the causal connection requirement."). The law in the Sixth Circuit is not altogether uniform on this issue, however, with "another line of cases in this circuit . . . standing for the proposition that temporal proximity alone is *not* sufficient to establish a causal connection for a retaliation claim. These cases required other evidence of retaliatory conduct, in addition to temporal proximity, to demonstrate a causal connection." *Mickey*, 516 F.3d at 528–29 (Batchelder, J., concurring) (citations omitted) (collecting cases).

Regardless of which line of cases is authoritative, however, Plaintiff has established a prima facie case of retaliation because he has established both temporal proximity and other evidence of retaliatory conduct. On January 27, 2009, Plaintiff complained to Mr. Rychlicki about several matters, including the disparate treatment Plaintiff believed that Mr. Owczarzak suffered at the hands of the emergency room nurse manager. Mr. Rychlicki, in turn, reported to Mr. Jore in a memorandum: "Guy stated that the nurse manager in the E.R. had a history [of] allowing the female staff [to] slide on offences and coming down hard on the male staff for similar offenses." Def.'s Mot. Ex. B, at 26–27. One week later, on February 3, Mr. Jore and Ms. Acton met with Plaintiff and terminated him. The "Notice of Corrective Action" references the conversation with Rychlicki, providing in pertinent part:

> During the course of that discussion you made accusations about how corrective actions were handled for situations you were not involved in. . . . This is a continued trend of disruptive behavior in the workplace and is unacceptable. In accordance with your last chance agreement on March 4, 2008[,] your conduct will result in the next step of corrective action [termination].

Pl.'s Opp'n Ex. 5. Thus, not only did the protected conduct occur very close in time to when the adverse action occurred, Defendant's own contemporaneous documents reference the protected conduct. Plaintiff has established a prima facie case of retaliation.

**B.**

Defendant, Plaintiff implicitly concedes, has proffered legitimate non-discriminatory reasons for terminating Plaintiff. *See* Pl.'s Br. 19–21 (addressing prima facie case and pretext, not absence of legitimate non-discriminatory reasons). Thus, the issue is whether Defendant's proffered reasons were mere pretext. The notice of corrective action which terminated Plaintiff's employment provides in full:

> On January 27, 2009 you had a discussion with Joe Rychlicki. During the course of that discussion you made accusations about how corrective actions were handled for situations you were not involved in. You also discussed an alleged "hit list" of employees[.] You referenced this list and informed Joe [Rychlicki] you were on it and were talking to others on it here at the hospital. Since learning of this information other instances of disruptive behavior have been brought to management[']s attention, such as making staff on [the Sixth Floor Intensive Care Unit] cry. This is a continued trend of disruptive behavior in the workplace and is unacceptable. In accordance with your last chance agreement on March 4, 2008[,] your conduct will result in the next step of corrective action [termination].

Pl.'s Opp'n Ex. 5. The "trend of disruptive behavior" spanned nearly a decade and included, inter alia, verbal and written complaints by physicians and patients, four suspensions, and a last chance agreement.

Specifically, in April 2002 Defendant suspended Plaintiff for one day for the "verbal abuse of a patient." Def.'s Mot. Ex. B, at 11. Two years later, Plaintiff was again issued a one-day suspension. *Id.* at 10. In January 2005, Defendant issued Plaintiff a written warning, but no suspension, for "inappropriate behavior while interacting [with] an associate from another unit." *Id.* at 9. Less than four months later, Plaintiff was again suspended, this time for two days. *Id.* at 8. In February 2008, Plaintiff was involved in five incidents that led to three-day suspension and a "Last Chance Agreement." *Id.* at 6–7. "We are giving you the opportunity to correct your behavior," the last chance agreement provided, but further cautioned: "please be advised that this

-22-

is your final warning and that any further incidents of disruptive behavior or violation of St. Mary's of Michigan policies will result in your immediate termination." *Id.* at 6, 7.

Incident to the last chance agreement, Plaintiff attended mandatory outside counseling, where the counselor recorded that Plaintiff "has a very strong almost abrasive personality. . . . Tact does not appear to be his fort[é]." Def.'s Mot. Ex. B, at 44. Under "Key Problem Areas," the counselor enumerated, inter alia, "inability to see himself as others see him" and "places blame on others." *Id.* at 45.

In May 2008, a female nurse complained of harassment; specifically, she complained that Plaintiff had been "making comments to [her] coworkers that [she] sleeps around." *Id.* at 29. No disciplinary action was taken; Mr. Jore instead instructed Plaintiff to "keep distance between himself and [the nurse in question]." *Id.* at 28. In August 2008, Mr. Jore was asked to investigate a complaint regarding Plaintiff's "rude [and] disrespectful behavior to staff [and Dr. Sheth]." *Id.* at 33. Mr. Jore recorded: "Guy was reminded that he was on a last chance agreement and this type of behavior could be detrimental to his continued employment." *Id.*

Then came the final incident of January 27, 2009, when Plaintiff asked to speak with Mr. Rychlicki privately. Following Plaintiff into a stairwell, Mr. Rychlicki recounts what happened next:

> In a loud tone and somewhat aggressively, he asked me why Rob Owczarzak was not offered the opportunity to transfer out of the emergency department rather than be terminated. . . . Then Guy stated that the nurse manager in the E.R. had a history [of] allowing the female staff [to] slide on offences and coming down hard on the male staff for similar offenses. . . . He then began to talk about a "hit list" that had been generated several months ago by someone in management. This list contained name[s] of nursing staff that w[ere] felt to be disruptive and undesirable. He then indicated that he was on that list and he had talked to several others that were on that list, some of which are employed elsewhere and as soon as the list was made available there may be legal action. . . .

> He then changed the subject to staff members on [the Sixth Floor Intensive Care Unit,] stating that several he talked to were likely to leave due to  th [sic] the incompetence of the management on all levels at St. Mary's of Michigan.  He went on to say that a new orient on [the Sixth Floor Intensive Care Unit] was dangerous due to the inability to take advice and after talking with this orient about patient care issues questioned the orient[']s knowledge.
>
> Finally he finished this conversation with a statement addressing his negative feeling about a new director that was just appointed, the job duties of several of the nurse managers and that they are incompetent in those positions.

Def.'s Mot.. Ex. B, at 26–27.  At a minimum, this conduct implicates the prohibitions in Defendant's associate handbook on "[i]nappropriate conduct or language," "[i]nsubordination," and "[d]isruptive behavior."  *Id.* at 41–42.

Plaintiff's assertion that these reasons for terminating him are mere pretext is unpersuasive.  Significantly, Plaintiff does not contend that this is a "mixed motives" case — one in which he suffered an adverse employment action because of both permissible and impermissible considerations.[2]  Rather, Plaintiff contends that Defendant's proffered reasons for the termination were mere pretext for its true motivation: retaliation for Plaintiff's protected activity of complaining of Defendant's discrimination against Mr. Owczarzak.  The evidence recounted above, however, establishes that Defendant had numerous legitimate, non-discriminatory reasons for terminating Plaintiff's employment.   Indeed, the only evidence Plaintiff has that the termination was pretext for retaliation is the timing of his termination and

---

[2] As an aside, a circuit split exists on whether a mixed-motive claim is cognizable in retaliation cases brought pursuant to Title VII. *Compare Smith v. Xerox Corp*., 602 F.3d 320, 332–34 (5th Cir. 2010) ("We therefore hold that to the extent we have previously required direct evidence of retaliation in order to obtain a mixed-motive jury instruction in a Title VII case, our decisions have been necessarily overruled by *Desert Palace*." (citing *Desert Palace v. Costa*, 539 U.S. 90 (2003)), *with Awad v. Nat'l City Bank*, No. 1:09-CV-00261, 2010 WL 1524411, at *10 n.4 (N.D. Ohio April 15, 2010) ("Congress enacted the 'mixed motive' analysis for claims of discrimination based on race, color, religion, sex, or national origin with Section 107(a) of the Civil Rights Act of 1991, codified at 42 U.S.C. § 2000e-2(m). However, the majority of the Courts of Appeals that have considered the issue have concluded that Section 2000e-2(m) does not apply to Title VII retaliation cases.").  The Sixth Circuit has not yet weighed in on the issue in a published decision. *But see Marbly v. Rubin*, No. 98-1846, 1999 WL 645662, at *2 n.2 (6th Cir. 1999) (table) (noting in dictum that a mixed motive claim "has been found to be inapplicable in Title VII retaliation cases").

the passing reference in the notice of corrective action to Plaintiff's complaint about Mr. Owczarzak's treatment. Regarding the timing, temporal proximity does not prove causation. And, although it can raise an inference in some cases, it does not do so here. Plaintiff was terminated a week after engaging in protected conduct, yet he was not terminated because of the protected conduct. He was terminated for his disruptive conduct and inappropriate behavior to a supervisor. Indeed, when asked what was discussed at the meeting, Plaintiff recalled in part:

> Like they say here, tried to discuss me with [sic] my behavior and I said like I've tried everything possible to make everybody happy around here from not talking to people to talking overly friendly to people to not being, you know, to just being straightforward and things along those lines, every communication technique possible with these staff members and yet the women around here continuously try to sit there and make things up and make allegations and make complaints.

Pl.'s Dep. 86:21–87:5. In sum, Plaintiff has advanced no evidence to rebut Defendant's evidence that it made an honest, reasonably informed and considered decision, based on Plaintiff's course of conduct, to terminate his employment. Defendant is entitled to summary judgment on Plaintiff's Title VII retaliation claim.

## V.

Having dismissed all of Plaintiff's federal law claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's sole remaining state law claims under the ELCRA. 28 U.S.C. § 1367(a) provides: "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." Indeed, "a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Moon v. Harrison Piping Supply*, 465 F.3d 719 (6th Cir. 2006) (citation omitted); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims

should be dismissed as well."); *Perry v. Se. Boll Weevil Eradication Found.*, 154 F. App'x 467, 478 (6th Cir. 2005) (noting that dismissal is the "clear rule of this circuit"). As the Supreme Court has emphasized, "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726.

## VI.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment (ECF No. 14) is **GRANTED**.

It is further **ORDERED** that Plaintiff's Title VII claims are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the exercise of supplemental jurisdiction over Plaintiff's remaining state law claims is **DECLINED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: November 7, 2011

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 7, 2011.

s/Tracy A. Jacobs
TRACY A. JACOBS

---